FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

AUG 2 1 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-30132- DRH |
| vs. | ) | |
| | ) | |
| KENNETH J. LEE, a/k/a | ) | Title 18, United States Code, |
| "James LEE" | ) | Sections 371, 401(3), 1001, 1014, 1028A, |
| | ) | 1341, 2320(a) |
| Defendant. | ) | |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### INTRODUCTION

At all times relevant:

1.      On or about January 27, 2006, **KENNETH J. LEE** (hereinafter "**LEE**") pled guilty in United States District Court in the Eastern District of Missouri in criminal case #4:06CR00071-CEJ to charges that he had committed mail fraud and failed to file an individual United States income tax return.

2.      In April of 2006, **LEE** was sentenced in case #4:06CR00071-CEJ to a period of imprisonment and ordered to pay certain financial penalties, including $586,746.79 in restitution, due and payable immediately, that the United States District Court ordered to be paid to the victims of the investment scheme.

3.      **LEE** was also ordered to serve three years of supervised release under the supervision of the United States Probation Office.  In addition to other conditions of his release on supervision, the defendant was ordered to comply with the following terms and conditions:

a.      The Defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

b.      The Defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;

c.      The Defendant shall provide the probation officer and the Financial Litigation Unit of the United States Attorney's Office with the access to any requested financial information.

d.      The Defendant shall apply all monies received from income tax refunds, lottery winnings, judgments, and/or other anticipated or unexpected financial gains to the outstanding Court-imposed financial obligations.  The defendant shall immediately notify the United States Probation Office of the receipt of any indicated monies.

e.      The Defendant shall be prohibited from incurring new credit charges or opening additional lines of credit without approval of the United States Probation Office so long as there is a balance on the Court-imposed financial obligations.

f.      The Defendant shall pay the restitution as previously ordered by the Court.

g.      The Defendant shall file all correct tax returns and forms required by the income tax laws of the United States, pay any taxes owed and, as requested by the United States Probation Office, provide copies of all filed tax forms.

h.      Payments of restitution shall be made to the Clerk of the Court for transfer to the victims.  Restitution is due immediately, through the Clerk of the Court, but may be paid from any prison earnings in compliance with the Inmate Financial Responsibility Program.  Any criminal monetary penalties that remain unpaid at the commencement of the term of imprisonment, shall be paid in a lump sum payment of $5,300, which is due

within 30 days of sentencing, and monthly installments of at least $300, or no less than 10% of the defendant's monthly gross earnings, whichever is greater, with payments to commence no later than 30 days after release from imprisonment.

4.      On May 22, 2009, **LEE** began serving his three year term of supervised release under the supervision of the United States Probation Office for the Southern District of Illinois.

5.      **LEE**, as part of his supervision, was required to file monthly reports entitled, "Monthly Supervision Report." Each supervision report contained the following warning:

> "WARNING: ANY FALSE STATEMENTS MAY RESULT IN REVOCATION OF PROBATION, SUPERVISED RELEASE, OR PAROLE, IN ADDITION TO 5 YEARS IMPRISONMENT, A $250,000 FINE, OR BOTH. (18 U.S.C. § 1001)."

### THE CONSPIRACY AND SCHEME TO DEFRAUD

6.      It was part of the conspiracy and scheme that **LEE,** while under supervision and a judicial order of restitution, along with others, would disguise, conceal, and fraudulently utilize corporate and business entities and aliases or otherwise hide assets and make false and fraudulent statements in order to defeat, defraud and avoid compliance with the United States District Court (District Court) orders of supervision and restitution, the United States Probation Office's (U.S. Probation) efforts to supervise and the Financial Litigation Unit of the United States Attorney's Office (FLU) efforts to collect restitution on behalf of the victims contained in the judicial restitution order for case number 4:06CR00071-CEJ.

7.      It was further part of the conspiracy and scheme that **LEE,** while incarcerated would continue to direct and supervise other members of the conspiracy utilizing in-person meetings, e-mail, United States Mail and telephone calls. These efforts were designed in-part or in-whole to amass income from various sources in a manner and method that would be shielded

from the Government's legitimate and lawful interest in enforcing the restitution order for victims in **LEE'S** criminal case 4:06CR00071-CEJ.

8.      Some of the actions taken by Lee and other co-conspirators are listed below; they include only a portion of the lies and deceptions perpetrated during the time frame alleged. These are sometimes listed by topic and not necessarily in chronological order and intended to show the length and extent of the actions taken by **LEE** and others to conceal, disguise and defraud in his attempts to prevent the Government from enforcing a lawful order of restitution to pay victims (people) the money that was rightfully owed them.

9.      Actions to fulfill the conspiracy and scheme began on or about April 17, 2006, three days after **LEE** had been sentenced in District Court in the Eastern District of Missouri in criminal case #4:06CR00071-CEJ, when **LEE** and KB began attempting to transfer money to offshore bank accounts.  (In or around March of 2006, prior to serving a term of imprisonment, **LEE** reported to U.S. Probation that he had total assets and net worth of $2,000.)

**While Incarcerated**

10.     On or about July 3, 2006, KB, at the direction of **LEE**, wired $5,000 from Southern Commercial Bank to Corporate Enterprises Inc. at the First Curacao International Bank in Curacao, Netherlands Antilles.

11.     In late 2007 or early 2008 **LEE** advised KB that KB would be receiving cash from an individual and that KB should use the money to pay business and personal expenses. KB did then receive approximately $300,000 in United States currency in two separate shipments from an unknown mail/parcel provider.  KB was instructed by **LEE** to not make large deposits of cash but instead to make deposits under $2,000 and in odd amounts.

4

12.     In early 2008 **LEE** mailed a letter from FCC Forrest City with the following instructions "… *please follow the plan I have outlined here and we will get there together.  1) I want you to start depositing cash into the Bank of American (5th Avenue account) to the tune of just under 2,000 per week (make it odd numbers like $1655 Or $1743) Then do the exact same thing with the 5th Avenue (Southern Commercial)*." **LEE** instructs "*3) Please [KB] pay attention to #1 here as far as deposits are concerned.  Very important*." **LEE** further instructs KB, "*do not dip into our 300 in working capital*." **LEE** further states, "*I have the capital, you have the score, this is a great financial marriage and partnership baby if you execute this strategy all things are possible for you and I.*"

13.     On or about January 18, 2008, at **LEE**'s direction, KB began making cash deposits.  The deposits continued by KB until December 2008 when **LEE** regained control. After being released from prison **LEE** and KB removed the remaining $50,000 to $100,000. Between February 4, 2009, and September 1, 2009, **LEE** deposited approximately $20,000 in cash into bank accounts in his name.

**While In Halfway House**

14.     On or about December 2, 2008, while serving a portion of his sentence at a halfway house in St. Louis, **LEE** opened an account with eBay/PayPal utilizing his originally assigned social security number XXX-XX-8024.  **LEE** previously applied for and obtained a new social security number from the Social Security Administration.  **LEE** would utilize his original number for financial actions, while the second number assigned, XXX-XX-6196 was the number he supplied to U.S. Probation in the Southern District of Illinois.  (The use of his original social security number to open accounts including merchant and credit accounts was utilized

throughout the time frame alleged herein as an effort to conceal and disguise these accounts and disrupt efforts of the Government to identify assets for **LEE's** victims.)

15.     On or about December 11, 2008, while at the halfway house, **LEE** created an account with StartLogic, a web hosting company.  Utilizing StartLogic's services **LEE** created or transferred the domains for new and existing web based companies.  These web companies are utilized along with others during the conspiracy and scheme to engage in multiple business activities.  These web based companies would and did generate income that was not reported to the Government.

**The PayPal Account**

16.     Between December 2008 and May 2012, a PayPal account controlled by **LEE** and used to sell various items had approximately $863,000 in financial transactions.  Information regarding these financial transactions and income generated was falsely and fraudulently withheld from U.S. Probation and the FLU of the United States Attorney's office.

a.     On May 17, 2012, shortly after the execution of a search of 22 Charles Drive, Glen Carbon, Illinois (hereinafter "Charles Drive"), in multiple phone calls from Perry County Jail with KL, LK, and CL, **LEE** directs them to transfer the remaining funds from the PayPal account to avoid seizure.  In a phone call with LK, **LEE** has LK verify the account balance, after **LEE** assures LK that LK's IP address could not be used to link LK to **LEE**.  **LEE** then instructs LK to "*get it out quick*".  Fifteen withdrawals were then made over a period of eleven days of approximately $29,000 from the account.  The money was then deposited into accounts of KL and CL.  **LEE** later called to verify all of the money had been in fact removed.

b.      On or about May 23, 2012, **LEE** completed CJA 23 – Financial Affidavit where he failed to disclose assets to the District Court, including those he had directed to be removed from the PayPal account.  Financial records indicate on that same date and at the direction of **LEE**, $4,000 was transferred from the PayPal account and deposited into two separate bank accounts in the names of CL and KL.

c.      On or about May 24 and May 27, 2012, there were two transactions of $10,000 and $5,000 respectively advanced from **LEE's** American Express card and deposited into the PayPal account.  The funds were then withdrawn and placed in the accounts KL and CL.  **LEE** later defaulted on the American Express Card.

d.      On or about August 20, 2012, during a phone conversation between **LEE** and CL, CL advised **LEE** the money that was pulled out on day one (PayPal account funds) had been used to pay **LEE's** credit cards and mortgage payments for Charles Drive.  (The Charles Drive mortgage payments are important because of **LEE's** continued failure throughout the course of the conspiracy and scheme to disclose this property and the actions (detailed later) taken to conceal the property from the Government).

**Under Supervision**

17.      In May of 2009, **LEE** began his supervision in the Southern District of Illinois by U.S. Probation.  **LEE** also began a multi-year series of lies and deceptions to prevent the Government in their lawful and legitimate efforts to seek restitution for **LEE's** victims.  From the first month and for years after, **LEE** would and did along with a myriad of other financial dealings fail to disclose the very existence of multiple bank accounts, businesses and the acquisition of substantial cash and assets.

7

**22 Charles Drive**

18.     Between April and September of 2010, **LEE** caused a Fixed Rate Loan

Modification Agreement for Charles Drive (a property **LEE** failed to disclose to the

Government) to be prepared and entered into by a financial institution.  This loan modification

and supporting documentation involved **LEE** forging the signature and other identifying

information regarding KB as well as false and fraudulent financial information to be conveyed to

the financial institution.  Some of **LEE**'s actions and efforts to fraudulently conceal and fail to

disclose ownership of the Charles Drive property are listed below:

    a.      On or about October 1, 2010, **LEE** made a payment on the loan

modification using his Commercial Bank account.  This account was never disclosed by

**LEE** to U.S. Probation or the FLU.

    b.      On or about May 4, 2011, in the Circuit Court for Madison County

Illinois, **LEE** was awarded free and clear claim on Charles Drive during his divorce.

    c.      While incarcerated in Perry County Jail on June 6, 2012, two years after

**LEE** had been awarded the house, in a phone call, **LEE** and SK discussed the possibility

of the seizure of the house at Charles Drive.

> SK:     *"They might come and seize that house."*
> **LEE**:    *"Well, it's not even in my name.  They can't seize what's not in my name."*
> SK:     *"Whose name is it in?"*
> **LEE**:    *"It's not in my name.  So let's leave it at that.  You know, they record these*
> *conversations; I can't talk on this phone."*
>           (Call #568694)

    d.      While incarcerated in FCC Forrest City on February 8, 2013, in a phone

call, **LEE** and CL discussed the loan modification and the true ownership of the house at

Charles Drive.

CL:   *"Let me get this straight, she thinks that, that what, you're not on, on a deed or something, or what?"*
**LEE**:   *"Yes, that's exactly right and the thing about it is – "*
CL:   *"Oh really?"*
**LEE**:   *"And the thing about it is that, that's exactly right because I can't have that shit in my name."*
CL:   *"Right."*
**LEE**:   *"Ok. But the divorce decree specifically spells out that the rights and that were signed to me."*
CL:   *"And did you – were you supposed to do anything with that?"*
**LEE**:   *"Well yeah, eventually. But, you know what, I can't put the fucker in my name."*
CL:   *"Right."*
**LEE**:   *"So whose am I supposed to put it in?"*
     (Call: 2/8/13 14:27:44)

     e.     On or about April 5, 2013, during a telephone conversation, CL told **LEE** that KB is uncomfortable signing a quit claim deed when it is transferring to a person KB does not know.  CL told **LEE** that CL had informed KB that the person receiving the deed is EL, for obvious reasons.  CL stated to **LEE** that CL told KB, *"who gives a shit who's on it as long as you're coming off it."*

     f.     Two years later, on or about March 27, 2015, in a telephone call (using another inmates calling number) from Perry County Jail with CL, **LEE** discusses forging a quit claim deed with KB's signature in order to obtain profits from Charles Drive, **LEE** tells CL to hold it up to the window.

     **LEE**: *"Get the deed done, you know? uh there's a signature with [KB]'s signature somewhere man.  I was just going to sign it just the way she did.  You know you just put the fucker next to a uh you tape it up to a window and you can literally sign."*
     CL: *"Alright, alright, alright."*
     (Call: 3/27/15 21:47:18)

**Fraudulent Use of GL's Identity**

19.      GL was an identified victim in **LEE's** 2006 conviction and is listed as a victim in the restitution order against **LEE**.  In or about 2010, **LEE** used his prior victim's (GL) identity to attempt to open a merchant account (an account that will allow credit cards to be used on websites).  In making the application, **LEE** not only used GL's name, he also supplied an altered driver's license that belonged to GL.  **LEE** also used GL's identity in various e-mails to conceal and disguise his own identity.

      a.      During an e-mail exchange in setting up the merchant account, **LEE** sent an e-mail from "G" to Redwood Merchant Services using the e-mail account james@corporate-pros.com.  Redwood Merchant Services responded to "G," at james@corporate-pros.com, and asked, "*why is the name James in your email address? I know my underwriting department will ask me this.*"  **LEE**, utilizing james@corporate-pros.com, responded as "G" stating, "*James is our accountant so I default these type of emails from his email so he is copied in.  My company email is [G]@corporate-pros.com.*"  On the same day that **LEE** replied as "G," the mailbox, [G]@corporate-pros.com was added to **LEE's** web servicing host.  (As detailed herein, **LEE** uses multiple ruses and names in order to carry out his business dealings – in this e-mail **LEE** utilizes both GL and "James" when he is in fact the sender.)

      b.      In or about October of 2010 **LEE** also submitted an application and supporting documentation via email using (victim) GL's identity to Pipeline Data in an attempt to obtain another merchant account.

**Flagship Merchant Services Account**

20.    On or about November 5, 2010, **LEE** submitted an application for a merchant account, this time to Flagship Merchant Services.  In the application he claims to be owner of Corporate Promotions & Incentives LLC and uses his original social security number and lists monthly sales of $25,000, and average high ticket sales of $4,000.  None of the above information was supplied to U.S. Probation for the Southern District of Illinois.

a.    On or about November 18, 2011, seventeen days after submitting a financial disclosure statement to the FLU of the United States Attorney's Office where he failed to disclose, among other things, the existence of the merchant account noted above and his ongoing association with Corporate Promotions & Incentives, **LEE** submitted a Processing Limit Change Form in an attempt to increase his processing volume.  In his request he stated, "[s]tarted wholesale division of company purchasing 50,000-75,000 in merchandise from Bloomingdale's and Macy's and wholesaling lots of merchandise." (In the financial disclosure to the FLU of the United States Attorney's Office, **LEE** falsely stated that he had stopped working with Corporate Promotions & Incentives on October 1, 2011, and falsely claimed that he had only worked in "sales/shipping.")

b.    On or about November 30, 2011, **LEE** submitted additional documentation to Flagship Merchant Services indicating that he was both the "managing member" and "owner" of Corporate Promotions & Incentives.  (This information was not supplied to the Government).

**False Statements**

21.    On or about March 1, 2011, **LEE** made false statements to FLU of the United States Attorney's Office in a Financial Statement of Debtor. **LEE** failed to disclose that he

controlled Corporate Promotions & Incentives, which owned two domain names that sold merchandise on the internet. He also falsely reported that he only had one checking account with a balance of just $170. When in fact the checking account **LEE** reported to the FLU was inactive and **LEE** had access to six other checking accounts, with a total balance over $17,890. **LEE** also claimed he had no credit cards, when in fact he had at least nine credit cards and also stated that he rented when in fact he paid $1,218.16 in monthly mortgage payments on Charles Drive.

22.     On or about September 30, 2011, **LEE** made materially false statements to U.S. Probation in a Monthly Supervision Report. In concealing his assets **LEE** reported only one checking account when he had at least four and claimed a balance of $800 when he had over $24,000 in those accounts.

**The Escalade**

23.     On or about October 28, 2011, **LEE** purchased a 2006 Cadillac Escalade. On the Applicants Credit Statement **LEE** listed himself as Owner/President of REI Liaison for the past six years with a salary of $175,000. **LEE**, however, failed to report ownership or use of the Cadillac Escalade on the CJA 23 Financial Affidavit he completed on May 23, 2012, for the District Court or to U.S. Probation or FLU of the United States Attorney's office. He also never reported an income of $175,000. Nine months later on July 20, 2012, during a jail call he discusses CL selling the Escalade in order to avoid the $500 monthly payment.

**False Statements**

24.     On or about November 1, 2011, **LEE** submitted materially false statements to the FLU of the United States Attorney's Office in a Financial Disclosure Statement. In the statement **LEE** failed to disclose his relationship with REI Liaison, a company he had just days earlier

claimed he owned on his application to buy the Cadillac Escalade. **LEE** also claimed that he rented, when in fact **LEE** was granted ownership to the Charles Drive residence in a divorce decree on May 4, 2011, and was making mortgage payments. **LEE** also claimed he had two bank accounts with $75.00 when in fact he had access to at least four with balances over $28,150. **LEE** also falsely claimed that he had no outstanding loans or debt, when in fact he had, two days prior, obtained a loan from Scott Credit Union to purchase the Cadillac Escalade, requiring 63 consecutive payments of $504.34 per month.

25.     On or about November 7, 2011, during a court authorized Citation to Discover Assets (Judgment Debtor Exam) **LEE** made false statements regarding a bank account known as Corporate Enterprises Land Trust. **LEE** stated that the bank account was at "Southern Commercial" and that the Corporate Enterprises Land Trust had no money in it, when in fact the trust was at a different bank (Commercial Bank) and had assets including a $5,000 deposit that was made that same day. **LEE** also falsely stated that he had not applied for credit in the last 12 months, when in fact he had opened lines of credit with Discover, attempted to open an account with Zero Halliburton, obtained credit from Citibank, and obtained a loan on a Cadillac Escalade from Scott Credit Union.

26.     On or about November 11, 2011, on a Monthly Supervision Report to U.S. Probation, **LEE** listed his employer as REI Liaison and for the first time listed his supervisor as LK. **LEE** listed REI Liaison as his employer and LK as his supervisor for the remainder of his time on supervised release, consisting of 13 separate months. This change in supervisor came just days after being questioned about "James Lee" by an Assistant United States Attorney in a Citation to Discover Assets (Judgment Debtor Exam).

27.     On or about December 31, 2011, **LEE** made materially false statements to U.S. Probation in a Monthly Supervision Report.  The false statements include **LEE's** claim that he had only one checking account with $85.00 when he in fact had access to at least four accounts with balances of at least $37,000. **LEE** also claimed to only have had one expenditure in the month of over $500 when in fact he made at least 19 expenditures over $500.

**The Storefront**

28.     In or about January 2012, **LEE** opened a business storefront located in Edwardsville, IL, and had at least one employee.  The business was engaged in selling purses, shoes, and other accessories that were obtained by **LEE** through various sources.  **LEE** paid $700 in monthly rent for the storefront.  **LEE,** however, failed to report the storefront expenditures or income to U.S. Probation or on any Monthly Supervision Report thereafter.  As an example, on his February 2012 Monthly Supervision Report to U.S. Probation **LEE** stated, regarding employment, that he was employed with Platinum Maintenance as an estimator, while there was no mention of this storefront.

29.     On or about May 10, 2012, during a search of the storefront operated by **LEE**, agents discovered a book entitled *Bulletproof Asset Protection* which includes the following statement:  "The prescription for making an asset bulletproof is first to make it invisible."  This book also describes how to place money in offshore bank accounts.

**False Statements**

30.     On or about May 23, 2012, **LEE** made materially false statements to the District Court of the Southern District of Illinois in a Financial Affidavit.  The false statements include his claiming to have only one checking account with $300, when he had access to an account

with at least $9,000.  **LEE** falsely claimed that he did not own his home at Charles Drive, and

that his residence was owned by a corporation owned by his ex-wife.  When in fact, **LEE** had

been granted sole interest in the home at Charles Drive in a divorce decree on May 4, 2011, and

had taken steps to conceal the true ownership of the property and prevent its seizure to help

satisfy the restitution owed to his previous victims.  **LEE** also falsely reported that his corporate

office was at his residence, Charles Drive, when in fact **LEE** had commercial rental property that

he did not disclose.  **LEE** did not disclose his monthly payments on the storefront or that on the

mortgage for Charles Drive.

**While Incarcerated**

31.     On or about July 1, 2012, during a telephone conversation with LK, **LEE**

discussed utilizing false information in financial and business dealings.  During the conversation,

while discussing these actions, LK tells **LEE** that CL wants to act honestly and upright and isn't

comfortable with bending the truth to get things done.  To which **LEE** responds *"[CL] better get*

*comfortable with it real quick."* (Call #582164)

32.     On or about July 18, 2012, in a telephone call with LK, **LEE** stated that in the

future he wants all of his income and assets under LK's name so that the Government can never

seize anything from him ever again.

> **LEE**: *"You can make the check.  Whatever it is that I'd be making, it can go on*
> *you.  You can take the income for it."*
> LK: *"Yeah."*
> **LEE**:  *"But I'm working for free."*
> LK: *"Yeah.  I think you should too."*
> **LEE**: *"And when they come and say something to me, I'll say, 'I'm working for*
> *free.'"*
> LK: *"Right."*
> **LEE**: *"My salary is one dollar a year."*
> LK: *"Yep."*
> **LEE**: *"Now, here's your, here's your 10 cents for taxes."*

LK: *"Yep, I would do that too."*
**LEE**: *"I'm not having any bank accounts.  Nothing.*"
LK: *"Nope.*"
**LEE**: *"So..*"
LK: *"Nothing.*"
**LEE**: *"Not a thing.  There's not going to be anything that they're going to be able to seize from me ever again."*
    (Call #589335)

## False Statements

33.    On or about October 7, 2013, **LEE** made materially false statements to U.S. Probation in a Monthly Supervision Report for the month of September of 2013.  The false statements included, **LEE** failing to report that on August 14, 2013, **LEE** and CL submitted Articles of Incorporation for 5th Avenue Capital Management Incorporated to the Florida Secretary of State.  **LEE** listed himself and signed as the Vice President and Secretary of the Corporation.  **LEE** and CL both maintained 50% shares of the Corporation.  His failure to disclose this employment made his report false because he certified that the information he provided was not just correct, but "complete."

34.    On or about January 6, 2014, **LEE** made materially false statements to U.S. Probation in a Monthly Supervision Report for the month of December of 2013.  The false statements included, **LEE** falsely reporting that his only access or ownership of a vehicle was a 1996 Chevrolet Van, owned by KKL Family Trust.  When in fact, **LEE**, along with CL attended in November of 2013 a seminar for Missouri Auto Dealers and had access to and was selling multiple vehicles, on various websites, over the internet.

35.    On or about February 24, 2014, **LEE** made materially false statements to U.S. Probation in a Financial Disclosure Statement.  The false statements included, but are not limited to the following:

a.      **LEE** falsely reported that the only bank account he had access to was First Clover Leaf Bank, when in fact, **LEE** also had access to other bank accounts, including an account with Bank of America and accounts held in the name of others.

b.      **LEE** falsely reported that he did not have access to credit cards and that all of his cards had been cancelled and were in collections.  However, in a search of **LEE**'s residence at Charles Drive, after this report, Probation Officers uncovered multiple credit cards and receipts reflecting **LEE**'s unreported expenditures during the time where he denied having the credit cards.

c.      **LEE** falsely reported that he had no income or source of compensation. **LEE** informed U.S. Probation that his only means of financial support were cash gifts from family.  When in fact, **LEE** was employed and made sales for REI Liaison, **LEE** was Vice President and a 50% shareholder of 5th Avenue Capital Management, Inc. **LEE** was also selling vehicles through 5th Avenue Motors over the internet.  Further, **LEE** acted as the General Manager of Enterprise Contracting Inc., which provided Subcontracting services for Platinum Maintenance.

d.      **LEE** again failed to report that he had been granted ownership interest of Charles Drive, and falsely reported to U.S. Probation that his father was permitting **LEE** to live at Charles Drive rent free.  When in fact, **LEE** was the only person making mortgage payments.

**"Fired" by Probation Officer**

36.      On or about March 31, 2014, **LEE** made materially false statements to U.S. Probation in a Monthly Supervision Report for the month of March of 2014.  The false statements included, **LEE** falsely reporting that he was not employed, and claiming that he had

been fired by his Probation Officer. He simply wrote "[f]ired by PO" in the spot for employment. The fired by Probation Officer was based on an attempt by U.S. Probation to do a site visit where he claimed to work. The probation officer was denied access and **LEE** thereafter claimed he was fired. Although claiming no employment, **LEE** was actually selling multiple vehicles and women's designer items over the internet on multiple websites. **LEE** also acted as General Manager of Enterprise Contracting, Inc., with which he subcontracted for both Platinum Maintenance and REI Liaison.

37.     The date where **LEE** claimed that he was fired because of the site visit by U.S. Probation is also the date where **LEE** falsely and fraudulent claimed in Social Security Disability forms that he became completely disabled. In forms filed with the Government **LEE** claims that his "condition" is so severe that he is unable to even put on his socks.

**Use of the Name "James Lee"**

38.     During the Conspiracy and Scheme as described herein, "James Lee" is often falsely identified as **LEE**'s supervisor as a means to manipulate other companies into working with him and to conceal from U.S. Probation, FLU and others that **LEE** is in fact in control of the corporation himself. These activities were falsely and fraudulently withheld from the Government.

a.     On or about April 17, 2006, in an attempt to open an off shore bank account with the First Curacao International Bank, **LEE** signed as "James Lee" on a document to authorize FCIB to take as a valid **LEE**'s signature. The bank recognized the difference between **LEE**'s name and his signature and requested **LEE** to sign another document with his legal name, as "Kenneth J. Lee."

b.      On August 10, 2011, **LEE** identified the true nature of "James Lee" in a personal email utilizing "James Lee's" Corporate Promotions e-mail account, james@corporate-pros.com.  The e-mail stated:

> "Lance": "*I don't know what is going on. Received these pics from Ken yesterday.*"
>
> "James": "*Yes, that is my first name, James is my middle name and my company e-mail address.*"

c.      On or about May 17, 2012, in a telephone call with LK, **LEE** and LK discuss the handling of customer calls while **LEE** is incarcerated.  During the call LK tells **LEE** that he (**LEE**) has had a heart attack.  During the conversation, they also discuss the use of the name "James Lee."

> LK: "*And by the way, you've had a heart attack*"
> **LEE**: "*Ok great.*"
> LK: (Laughter)
> **LEE**: "*Just about have.*"
> …
> LK: "*I'm confused – I don't even want to talk about it over the phone.  It's ok.*"
> **LEE**: "*Confused about what?*"
> LK:  "*One, one, of the buyers asked me about James.  'Can I talk to James?'*"
> **LEE**: "*Oh, yeah.  Just tell them that he's (laughter) in the warehouse working, trying to get all of this straightened out.*"
>        (Call #561979)

d.      On or about January 13, 2011, **LEE** attempted to open an account for Corporate Promotions & Incentives with Zero Halliburton.  **LEE** listed himself as the CEO of Corporate Promotions & Incentives, and listed "James Lee" as an Authorized Buyer and Accounts Payable.

e.      On or about July 13, 2011, ML, Director of Special Markets of Tumi, sent an e-mail to "James Lee," at the e-mail address james@corporate-pros.com, and the subject line "www.efashionplus.com." The e-mail stated:

*"James, is this you? I'm told that the phone answers to a company that sounds like yours. If so you must take Tumi off this site immediately. Please advise."*

"James Lee" responded: *"[ML], no this is not my business, this is my ex-wife's company and I do not have any affiliation with it what so ever, I don't sell to her either. I will forward this email on to her and let her know you want it taken down. I am certain she will comply."*

   f.     On or about September 6, 2011, **LEE** applied for an account with Maui

Jim, listing himself as Principal of Corporate Promotions & Incentives. **LEE** listed

"James Lee" as the Accounts Payable and the Purchasing contact.

### Fraudulent eBay Accounts

39.     In or about 2011 and 2012, **LEE** obtained, and attempted to obtain, hacked or

fraudulently acquired eBay accounts. These accounts would be in the name of other individuals

and then could be used to sell items in a manner that concealed the true owner of the accounts as

well as assets acquired by these accounts. The information, accounts and financial dealings were

falsely and fraudulently withheld from the Government. These efforts included, but are not

limited to the following:

   a.     Between January and March of 2011, **LEE**, using his own identity,

purchased an eBay/PayPal account along with the personally identifying information

from a fraudulent account seller.

   b.     On or about April 3, 2011, **LEE**, using his own identity, contacted a

fraudulent account seller in an attempt to purchase an account. During an email

exchange, **LEE** asked the seller, *"[q]uestion for you, do you have aged accounts? Ones*

*that will not have the selling limit on them of 10 items and 2K per month, along with the*

*paypal info? Any with feedback? if so I would buy one of those accounts. Let me know*

*what you have available."*

c.  In and around September of 2011, **LEE**, using the alias "James Lee," purchased an eBay/PayPal account from a fraudulent account seller that contained the username and personally identifying information.

d.  During March of 2012, **LEE**, using the alias "James Lee," contacted a fraudulent account seller in an attempt to purchase an account. During an email exchange, the seller asked **LEE** where he was located, to which **LEE** replied, "*I am in the US in Illinois I sell mainly ladies handbags, shoes, luggage, before I was suspended due to my roommates linked account I was doing 50K a month in sales on eBay, over 600K on paypal. I obviously know that I would have to start out slow with a new account.*"

40.  During the time frame alleged in the indictment, **LEE** would and did utilize various entities, names, and ruses to conceal and disguise business dealings and assets. **LEE** utilized assets generated by his various business and financial dealings to pay personal expenses and all the while concealing those assets from the legitimate efforts of the Government to obtain restitution for **LEE**'s prior victims.

**COUNT 1**
Conspiracy

41.  Paragraphs 1 through 40 are incorporated by reference as fully set forth herein.

42.  That from in or around April of 2006 and continuing thereafter until in or around July of 2015, in Madison County in Illinois, within the Southern District of Illinois and elsewhere including but not limited to Illinois and Missouri,

**KENNETH J. LEE,**

defendant, knowingly conspired and agreed with other persons both known and unknown to the Grand Jury:

a.   to commit an offense against the United States of America by knowingly and willfully making and using false statements and documents knowing the same to contain materially false, fictitious and fraudulent statements and entries, namely statements and representations made to United States Probation and the United States Attorney's Office regarding the defendant's business, finances and assets

b.   to defraud the United States of America by taking actions and directing others to take actions designed in whole or in-part to prevent the United States from enforcing the restitution order entered against the defendant in the Eastern District of Missouri in case 4:06CR00071-CEJ

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
Criminal Contempt of Court

43.   Paragraphs 1 through 40 are incorporated by reference.

44.   From on or about April of 2006 and continuing thereafter until in or around July of 2015, in St. Clair County, Illinois, within the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, acted in contempt of the authority of the United States District Court of the Southern District of Illinois by disobedience and resistance to its lawful writ, process, order, rule, decree, or command, in that the defendant did willfully violate a reasonably-specific and lawful order of the United States District Court of the Southern District of Illinois, by refusing to comply with an order to pay restitution, previously entered by the United States District Court for the Eastern

District of Missouri in case number 4:06CR00071-CEJ.  All in violation of Title 18, United States Code, Section 401(3).

### COUNT 3
Mail Fraud

45.     Paragraphs 1 through 40 are incorporated by reference.

46.     From in or around April of 2006, to in or around July of 2015, in St. Clair County, in the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, with the intent to defraud, with knowledge of its fraudulent nature, devised the above-described scheme and artifice to defraud and conceal assets by materially false and fraudulent pretenses and representations.

47.     On or about November 3, 2011, in St. Clair County, in the Southern District of Illinois, for the purpose of executing the above-described scheme and artifice to defraud and deprive, Defendant knowingly caused to be placed in an authorized depository for mail, to be sent and delivered by the United States Postal Service, a letter addressed to an Assistant United States Attorney at 9 Executive Dr., Suite 300, Fairview Heights, Illinois 62208, containing a Financial Statement of Debtor filled out and signed by **KENNETH J. LEE** as a means to falsely and fraudulently conceal assets from the Government.  All in violation of Title 18, United States Code, 1341.

### COUNT 4
Bank Fraud

48.     On or about September 29, 2010, in Madison County, in the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, knowingly made a material false statement for the purpose of influencing the action

of GMAC Mortgage, backed by Federal Deposit Insurance Corporation in connection with a

loan, in that **KENNETH J. LEE** represented, along with supplying other false information, that

KB was applying for the loan modification on the property located at Charles Drive by

submitting a Fixed Rate Loan Modification Agreement with KB's forged signature, when in

truth and in fact, as the defendant well knew, that KB had no knowledge of the loan modification

in KB's name or property, and did not sign documents requesting the loan modification from

GMAC Mortgage.  All in violation of Title 18, United States Code, Section 1014.

## COUNT 5
Bank Fraud

49.     From on or about October 28, 2011, in Madison and St. Clair Counties, in the

Southern District of Illinois, and elsewhere in Missouri and Illinois,

### KENNETH J. LEE,

defendant, knowingly made a material false statement for the purpose of influencing the action

of Scott Credit Union, federally insured by the National Credit Union Administration, in

connection with an application, in that **KENNETH J. LEE** made false and fraudulent

representations regarding his residence, income, and nature of employment on a credit

application that he caused to be submitted to Scott Credit Union, when, in truth and in fact, as the

defendant well knew this information to be false.  All in violation of Title 18, United States

Code, Section 1014.

## COUNT 6
False Statements

50.     On or about March 1, 2011, in St. Clair County, within the Southern District of

Illinois,

**KENNETH J. LEE,**

defendant, did willfully and knowingly make and use a false writing and document, knowing the

same to contain a materially false, fictitious and fraudulent statement and entry, in a matter

within the jurisdiction of the executive branch of the Government of the United States, by

submitting a Financial Statement of Debtor containing materially false entries regarding

**KENNETH J. LEE**'s financial assets to the United States Department of Justice, well knowing

and believing that he had access to financial assets that he was not reporting or revealing.  All in

violation of Title 18, United States Code, Section 1001.

## COUNT 7
False Statements

51.      On or about May 23, 2012, in St. Clair County, in the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, did willfully and knowingly make and use a false writing and document, knowing the

same to contain a materially false, fictitious and fraudulent statement and entry, in a matter

within the jurisdiction of the judicial branch of the Government of the United States, by

submitting a Financial Affidavit containing materially false entries regarding **KENNETH J.**

**LEE**'s financial assets, accounts, and expenditures to the United States District Court for the

Southern District of Illinois, well knowing and believing that he had access to financial assets

and accounts that he was not reporting or revealing.  All in violation of Title 18, United States

Code, Section 1001.

## COUNTS 8-13
False Statements

52.      On or about each date specified below, in St. Clair County, in the Southern

District of Illinois,

**KENNETH J. LEE,**

defendant, did willfully and knowingly make and use a false writing and document, knowing the

same to contain a materially false, fictitious and fraudulent statement and entry, in a matter

within the jurisdiction of the judicial branch of the Government of the United States, by

submitting Monthly Supervision Reports ("MSR") or a Financial Disclosure Statement

containing materially false reports of **KENNETH J. LEE**'s financial assets, nature of

employment, monthly expenditures, and ownership of residence to the United States Probation

Office, well knowing and believing that his financial assets, nature of employment, monthly

expenditures, and ownership of residence were different from what he was falsely and

fraudulently reporting and revealing.  Each count summarized below is in violation of Title 18,

United States Code, Section 1001.

| Count | Date | Document | False Statement |
|-------|------|----------|-----------------|
| **COUNT 8** | 9/30/2011 | September 2011<br><br>Monthly Supervision Report | **LEE** falsely reported or failed to report assets including a home, financial information including bank accounts and funds available, his business dealings, expenditures over $500, his employment and supervisor. |
| **COUNT 9** | 12/31/2011 | December 2011<br><br>Monthly Supervision Report | **LEE** falsely reported or failed to report assets including a home, financial information including bank accounts and funds available, his business dealings, expenditures over $500, and his employment. |
| **COUNT 10** | 10/7/2013 | September 2013<br><br>Monthly Supervision Report | **LEE** falsely reported or failed to report assets including a home, financial information including bank accounts and funds available, his business dealings, expenditures over $500, and his employment. |

| COUNT 11 | 1/6/2014 | December 2013<br><br>Monthly Supervision Report | **LEE** falsely reported or failed to report assets including a home, financial information including bank accounts and funds available, his business dealings including the sale of motor vehicles, expenditures over $500, and his employment. |
|---|---|---|---|
| COUNT 12 | 2/24/2014 | Financial Disclosure Statement | **LEE** falsely reported or failed to report assets including a home, financial information including bank accounts and funds available, the use and access of credit card, and his business dealings. |
| COUNT 13 | 3/31/2014 | March 2014<br><br>Monthly Supervision Report | **LEE** falsely reported or failed to report assets including a home, financial information including bank accounts and funds available, his business dealings including the sale of motor vehicles and other items, and his employment. |

## COUNT 14
### False Statements

53.     On or about February 18, 2014, in St. Clair County, within the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the judicial branch of the Government of the United States, by making false and misleading statements to a United States Probation Officer.  The statements and representations regarding his sources of income were false because **KENNETH J. LEE** then and there knew that his source of income included the

27

sale of motor vehicles that he was not reporting or revealing.  All in violation of Title 18, United States Code, Section 1001.

### COUNT 15
False Statement

54.    On or about February 17, 2015, in St. Clair County, within the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by willfully and fraudulently appealing a denial of his application for Social Security Disability benefits.  The statements and representations were false because, as **KENNETH J. LEE** then and there knew the application for Social Security Disability benefits contained false entries.  All in violation of Title 18, United States Code, Section 1001.

### COUNT 16
Aggravated Identity Theft

55.    In or around October of 2010, in Madison County, in the Southern District of Illinois,

**KENNETH J. LEE,**

defendant, did knowingly use, without legal authority, a means of identification of another person, GL, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit Conspiracy to Defraud the United States as alleged in Count 1, knowing that the means of identification belonged to another actual person.  All in violation of Title 18, United States Code, Section 1028A(a)(1).

28

## COUNT 17
Trafficking in Counterfeit Goods

56.     Beginning in or around 2010 and continuing until May of 2012, in Madison County, within the Southern District of Illinois,

### KENNETH J. LEE,

defendant, did intentionally traffic in and attempt to traffic in goods, including designer purses, knowingly using on and in connection with such goods one or more counterfeit marks, including spurious marks identical to and substantially indistinguishable from marks owned by Prada, Dolce and Gabbana, and Coach, which marks are and were in use and are and were registered for such goods on the principle registry of the United States Patent and Trademark Office, the use of which counterfeit marks is and was likely to cause confusion, to cause mistake, and to deceive, all in violation of Title 18, United States Code, Sections 2320(a) and 2.

**A TRUE BILL**

RANLEY R. KILLIAN
Assistant United States Attorney

STEPHEN R. WIGGINTON
United States Attorney

Recommended Bond:  Detention